# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TENNESSEE
### AT KNOXVILLE

| | | |
|---|---|---|
| CUBEN LAGRONE, | ) | |
| | ) | Case No. 3:20-cv-406 |
| *Petitioner*, | ) | |
| | ) | Judge Travis R. McDonough |
| v. | ) | |
| | ) | Magistrate Judge Debra C. Poplin |
| MIKE PARRIS, | ) | |
| | ) | |
| *Respondent*. | ) | |

---

## MEMORANDUM OPINION

---

Before the Court is Petitioner Cuben Lagrone's pro se petition under 28 U.S.C. § 2254, in which he seeks relief from his state convictions for attempted first- and second-degree murder and related offenses (Doc. 1). Petitioner filed a memorandum in support of his petition (Doc. 2). Respondent filed the state court record (Doc. 8) and a response in opposition (Doc. 9). After reviewing the parties' filings and the state court record, the Court finds that Petitioner is not entitled to relief under § 2254. Accordingly, no evidentiary hearing is warranted, *see* Rules Governing § 2254 Cases, Rule 8(a) and *Schriro v. Landrigan*, 550 U.S. 465, 474 (2007), the petition for a writ of habeas corpus will be **DENIED**, and this action will be **DISMISSED**.

## I.     PROCEDURAL HISTORY

In August of 2013, a jury in Knox County, Tennessee, found Petitioner guilty of attempted first-degree murder, attempted second-degree murder, two counts of employing a firearm during the commission of a dangerous felony, and reckless endangerment. (Doc. 8-1, at 48–49.) The trial court sentenced Petitioner as a Range II multiple offender to a total effective sentence of sixty-five years' imprisonment. (*Id.* at 143–147; Doc. 8-11, at 37); *see also State v.*

*Lagrone*, No. E2014-02402-CCA-R3-CD, 2016 Tenn. Crim. App. LEXIS 751, at *1–2 (Tenn. Crim. App. Sep. 30, 2016). Petitioner appealed his convictions and sentence. *Id.* at *2–3. The Tennessee Court of Criminal Appeals ("TCCA") remanded two judgments for employing a firearm for re-sentencing but otherwise affirmed the rulings of the trial court. *Id.* at *110. Petitioner filed an application for discretionary review with the Tennessee Supreme Court, which was denied. *State v. Lagrone*, No. E2014-02402-SC-R11-CD, 2017 Tenn. LEXIS 97 (Tenn. Feb. 15, 2017).

Next, Petitioner filed a pro se motion for post-conviction relief in Knox County Criminal Court. (Doc. 8-33, at 4–57.) The post-conviction court appointed counsel to represent Petitioner in those proceedings. (*Id.* at 59.) Petitioner's counsel filed an amended motion for post-conviction relief. (*Id.* at 63–64.) At an evidentiary hearing on the matter, Petitioner proceeded on the single claim that trial counsel was ineffective for calling the responding officer, Ty Compton, as a defense witness. (Doc. 8-34, at 11, 52.) After the evidentiary hearing, the post-conviction court denied relief. (*Id.* at 74; Doc. 8-33, at 66.) Petitioner appealed, and the TCCA affirmed. *Lagrone v. State*, No. E2019-01825-CCA-R3-PC, 2020 Tenn. Crim. App. LEXIS 426 (Tenn. Crim. App. June 19, 2020).

Petitioner then timely filed the instant petition for a writ of habeas corpus (Doc. 1).

## II.    FACTUAL BACKGROUND

This case arises from an August 2012 shooting into the home of Oracle West and her son LaJuan Harbison. In its opinion denying Petitioner's direct appeal, the TCCA summarized the evidence at trial as follows:

> [The State's first witness] Michael Mayes testified that he worked at the Knox County Emergency Communications Office as a record keeper. The State then sought to introduce a recording of a 911 call under the hearsay exception of excited utterance. Mr. Mayes testified that the recording was made on August 10,

2012, at 2:00 p.m. and that the call came from the cell phone number 865-257-2781. On the recording, which the State played aloud for the jury, a woman identified herself as Oracle West and asked for an officer to respond to her residence. Ms. West stated that her house had been "shot up" by "a dude named Cuben Bailey." Ms. West stated that this person had previously called her and threatened to "shoot up" her house. She stated that she did not know why the man had "shot up" the house but acknowledged that the Defendant had a problem with her son. The dispatcher asked Ms. West if she was leaving the house, and Ms. West replied that she was not leaving but was moving her vehicle. Ms. West estimated that ten shots were fired. When asked if she had a safe place to wait for officers to respond, Ms. West replied that she did not know where a safe place would be and that she was afraid to go inside her house. She stated that the incident was "awful."

On cross-examination, Mr. Mayes agreed that the caller said in the recording that her house had been "shot up" but not that she had been shot "at." He agreed that the caller stated that no one had been injured. Mr. Mayes stated that the caller called 911 from a cell phone, as opposed to a landline.

Rachel Warren of the KPD testified that she was an evidence technician and that she responded to a shooting call at 1608 N. Fourth Avenue on August 10, 2012. She photographed the inside and outside of the house, as well as shell casings found at the scene. Officer Warren identified the photographs she took, including several photos of bullet holes on the outside of the house. She also identified several photos of bullet holes found inside the house, including in the bedroom wall and in the headboard of the bed inside the bedroom. Officer Warren stated that she then collected a total of fifteen shell casings from the scene, consisting of .380 caliber, .40 caliber, and .9 millimeter, and she also collected several bullet cores. She recovered nine .40 caliber casings, one .380 caliber casing, four .9 millimeter casings and one shell casing not identified in size.

At this point in the trial, outside the presence of the jury, the State informed the trial court that it intended to call two lay witnesses to testify but that the witnesses were "terrified" and "concerned [about] who's going to protect them." The trial court questioned both witnesses, Daisy Smith and Oracle West, about their misgivings. Ms. Smith stated that she was not afraid but did not feel "comfortable with testifying" because she had kids. The trial court informed her that was "not a legal ground for refusing to testify." Ms. West stated that she had received her subpoena that day and was not told she would be testifying. She stated that she did not have any protection and that she had had too many "run-ins" with shootings. The trial court advised Ms. West that she had not offered a legal basis for refusing to testify. The trial court then asked the State if it intended to ask either of the witnesses any incriminating questions, and the State replied "No." The trial court then instructed the witnesses to testify.

In the presence of the jury, Daisy Smith testified that she had seen the Defendant in the streets but did not "hang out" with him. She testified that she had knowledge that the Defendant's mother's last name was "Bailey." Ms. Smith testified that Mr. Harbison was her cousin, and his mother was Ms. West.

Ms. Smith testified that on August 10, 2012, she received a phone call on her cell phone from the Defendant. The Defendant asked Ms. Smith to get in touch with her cousin, Mr. Harbison. Ms. Smith told the Defendant that she was not sure she could but that she would reach out to Ms. West in an attempt to contact Mr. Harbison. Ms. Smith then called Ms. West, with the Defendant on "three-way," and asked Ms. West if Mr. Harbison was home. Ms. West proceeded to call Mr. Harbison on "three-way," and so four people were on the phone call. When they were all on the phone call, Ms. Smith told Mr. Harbison that the Defendant wanted to talk to Mr. Harbison. The Defendant asked Mr. Harbison if he had any "beef" with the Defendant, and Mr. Harbison replied "no." The Defendant asked Mr. Harbison that same question three times and then asked Mr. Harbison where he was at that time. Then Ms. Smith heard what she first thought was static on the phone call, but she then assumed the sound was gunshots, and then the phone call ended.

Ms. Smith identified a phone number displayed as an incoming call on the Defendant's cell phone records, at 12:28 p.m. on August 10, 2012, as her phone number in August of 2012. The State showed Ms. Smith the photographs taken of the house, and she identified Ms. West's bedroom and bed, and Mr. Harbison's bedroom. Ms. Smith recalled that, after she hung up from the four-way call, she called Ms. West again but was not able to contact Ms. West until an hour after the four-way call.

On cross-examination, Ms. Smith testified that she had no idea if the Defendant was the person on the phone call. Ms. Smith agreed that she called the Defendant, after he initially called her, because the phone the Defendant called her from "went dead." She agreed that she did not know whether the Defendant had shot Ms. West's and Mr. Harbison's house. Ms. Smith confirmed that Ms. West and Mr. Harbison were both at home during the call, in their separate bedrooms.

Oracle West testified that she was a diagnostic evaluator for emotionally disturbed children. She stated that Mr. Harbison was her son, and she did not know the Defendant. She testified that she had heard the Defendant's name through her jobs at various schools. Ms. West testified that she lived with Mr. Harbison on August 10, 2012, and that she owned two vehicles at that time, a Toyota and a Dodge. Mr. Harbison owned a Chevy. Ms. West stated that she did not want to testify.

Ms. West testified that on August 10, 2012, she received a phone call from someone who asked to speak to Mr. Harbison. Ms. West testified that she called Mr. Harbison on "three-way" but that she could not recall what was said during

4

the conversation. She was in her bedroom at the time. At some point, gunshots started coming into her house, so she "hit the floor." "After everything was over," Mr. Harbison left the house. Ms. West called him repeatedly and then called 911. Ms. West got into her car to go and look for Mr. Harbison but decided to wait at the house for the police to arrive.

On cross-examination, Ms. West testified that she waited fifteen to twenty-five minutes after the shooting to call the police because she was "trying to calm [her] child down." She stated that she did not recall that the delay between the shooting and her call to 911 was an hour and a half. Ms. West stated that she did not know of any "beef" between the Defendant and Mr. Harbison. Ms. West agreed that she called the Defendant's phone one time after the shooting. She stated that she called Mr. Harbison multiple times after the shooting and after he left the house. Ms. West stated that she could not remember how soon after the four-way phone call the shooting started at her house.

On redirect-examination, Ms. West stated that, after the shooting, she was more concerned about calling Mr. Harbison than the police because she did not want her son to go out and do something "stupid."

KPD Officer Matt Peters testified that he came into contact with the Defendant on August 21, 2012, when the Defendant was a passenger in a vehicle involved in a minor traffic accident between two vehicles. When Officer Peters arrived at the scene of the accident, he observed the Defendant and the other occupants standing outside the vehicles. Officer Peters observed both vehicles, spoke to both drivers, and wrote a citation for the "at-fault" driver, Ms. Blair. The Defendant was a passenger in Ms. Blair's vehicle.

During the time that Officer Peters was at the scene of the accident, several other officers arrived to assist. One officer brought a K-9 officer to the scene to perform a smell test for narcotics; the K-9 showed "positive" behavior that Ms. Blair's vehicle contained narcotics. During a subsequent search of Ms. Blair's vehicle, Officer Peters detected the smell of marijuana. He searched the trunk of the vehicle and located a black backpack containing three loaded weapons. Officer Peters identified in court the three weapons contained in the backpack. He identified one weapon as a "Ruger," which had been loaded with .9 millimeter bullets. He identified the second weapon as a "Makarel," which had been loaded with .380 caliber bullets. He identified the third weapon as a "Smith and Wesson," which was loaded with .40 caliber bullets.

On cross-examination, Officer Peters testified that there was minor damage to both vehicles from the accident. He agreed that he found drugs in the passenger compartment of Ms. Blair's vehicle and the weapons in the trunk. Officer Peters also found a "South College" student identification card belonging to "Christian Moore" inside the backpack and nothing that indicated that it belonged to the Defendant. Officer Peters stated the Defendant was transported from the scene to

the police department where he was interviewed by Investigator Wardlaw before being released. During his interview with Investigator Wardlaw, the Defendant identified someone else as the owner of the backpack, but Officer Peters could not recall the name that the Defendant provided.

Officer Patricia Resig, a KPD firearms examiner, testified as an expert witness in the field of firearm identification and examination. Officer Resig examined the fired cartridge cases recovered from the scene of the August 10, 2012 shooting. She also examined the three weapons found inside the backpack, a Ruger P85, a Smith and Wesson SD40, and a Makarel KBI. Officer Resig testified that, based on her training and expertise, she could identify individual markings and characteristics on the fired cartridge casings or bullets and determine with one hundred percent scientific certainty whether they were fired from a specific gun. Based on the markings on the fired cartridge casings found at the scene, she determined that two of the fired .9 millimeter casings were fired from the Ruger and nine of the .40 caliber casings were fired from the Smith and Wesson.

Officer Resig testified that she had viewed "a video." It is unclear from the record which video Officer Resig viewed, however, she stated that she observed weapons in the video. Our review of the record indicates that multiple videos admitted into evidence depict the Defendant and other persons displaying or holding weapons. She stated the weapons depicted in the video were consistent with the Ruger and the Smith and Wesson guns she examined.

Investigator Shelley Clemons recalled responding to the scene where officers had stopped a vehicle driven by the Defendant at Fort Sanders Hospital on September 10, 2012. She photographed the vehicle and its contents, including a cell phone. She took possession of the cell phone, a cell phone charger, and the Defendant's driver's license. She stored the cell phone in "Inventory Control."

Lieutenant Vincent Ayub testified that he worked in the KPD forensic unit and was admitted as an expert in cell phone examinations. Lieutenant Ayub examined the Defendant's cell phone and extracted information from it on November 15, 2012. The trial court admitted into evidence a report of the extracted information, which included a call log from the Defendant's phone, and list of contacts, and five video files modified or "finalized" on various days in August 2012. The court admitted the videos as exhibits.

On cross-examination, Lieutenant Ayub testified that the Defendant's cell phone number was 865-308-0222. On redirect-examination, Lieutenant Ayub confirmed that he had the ability to determine when the cell phone videos were created.

Investigator Brandon Wardlaw, a KPD officer, responded to the scene of the shooting on August 10, 2012 and spoke with Ms. West. He described finding shell casings on the ground outside the house and bullets inside the house. After speaking with Ms. West, Investigator Wardlaw returned to his office and began

following up on some leads he had generated. Investigator Wardlaw agreed that he knew LaQuinton Brown, Tony Dixon, and Carlos Campbell from working as an investigator and stated that he could recognize the three men if he saw them in a photograph or video. Investigator Wardlaw stated that the Defendant's mother's last name was Bailey.

Investigator Wardlaw testified that he was aware of the weapons seized from the trunk of Ms. Blair's vehicle at the August 21, 2012 traffic accident. He was also aware that officers had seized the Defendant's cell phone, and Lieutenant Ayub had created a report on the contents of the cell phone, including the videos. The State showed Investigator Wardlaw one of the cell phone videos, and the video was played for the jury, during which Investigator Wardlaw identified the Defendant and Mr. Brown inside a vehicle. The two men were seated inside a car, driving around a neighborhood. In the video, the Defendant was holding a Smith and Wesson gun, which Investigator Wardlaw stated he thought looked like a .9 millimeter. The State showed Investigator Wardlaw the weapon seized from the vehicle during the traffic accident, and he identified an insignia on the weapon consistent with the weapon shown in the video. The State showed Investigator Wardlaw another cell phone video which was played for the jury. In the video, the Defendant was seen slowly driving a car, at night, while a woman hung onto the driver's side window frame from the outside of the car, conversing with the Defendant. Investigator Wardlaw stated that the Defendant was holding a weapon in his lap in this video. The State showed Investigator Wardlaw a third video which was played for the jury and he identified the Defendant, Mr. Dixon, and Mr. Brown. In the video, the three men were shown walking around a neighborhood.

On cross-examination, Investigator Wardlaw agreed that he was the officer in charge of the investigation of the August 10, 2012 shooting. He agreed that officers did not find any fingerprints on the three weapons seized from the vehicle involved in the August 21, 2012 accident or on the cartridge casings recovered at the scene of the shooting. He agreed that he reviewed phone records from the Defendant's phone number. The State objected to the admission of the phone records without the record keeper present to lay the foundation for the records; the Defendant reserved further cross-examination of Investigator Wardlaw until after the phone records had been authenticated and admitted as evidence.

Lieutenant Steve Patrick testified that he was employed as a record keeper of inmate files and jail calls for the Knox County Sheriff's Office. He identified several portions of several phone calls made by the Defendant from the jail, the trial court admitted them into evidence, and the State played them aloud for the jury. We have listened to the portions of the phone calls and very little of what was said is intelligible. We have discerned from the calls and other evidence at trial that the Defendant wanted the woman to whom he was speaking, Ms. Blair, to get in touch with Tony Dixon and/or Mr. Dixon's mother and ask them to "help out" the Defendant by either not talking to the police or not coming to court.

7

The State rested its case and the Defendant moved for a judgment of acquittal on all counts of the indictment, arguing that there was insufficient identification of the Defendant as a participant in the August 10, 2012 shooting. The trial court heard further argument from both sides and denied the Defendant's motion.

On behalf of the Defendant, Clint Greene testified that he worked for AT&T as a records custodian and that he kept records for the phone number 865-308-0222, the Defendant's phone number. He identified the records for the time period of August 9-10, 2012; the trial court admitted those records into evidence. Mr. Greene testified that the phone records only showed incoming and outgoing calls, not three-way calls. Mr. Green testified that the Defendant's cell phone received a call at 12:28 p.m. on August 10, 2012, from a cell phone number registered to Ms. Smith. The "elapsed time" of the phone call was four minutes and two seconds. He reiterated that the records did not indicate whether this phone call was a three-way call. The next call the Defendant received was at 2:51 p.m. on August 10, 2012, from a phone number registered to Ms. West. The line remained "open" for 26 seconds. He testified that the Defendant never called Ms. West.

Ty Compton, a KPD officer, responded to Ms. West's and Mr. Harbison's house where he spoke with Ms. West. Ms. West told him that, prior to the shooting, she had received a call from someone named "Cub[e]n." The caller's phone number was blocked. Ms. West told Officer Compton that "right after . . . the phone hung up . . . shots rang out."

Ms. West told Officer Compton that her son, Mr. Harbison, and the Defendant knew each other and had "engaged in a prior incident" at a club. She said that Mr. Harbison had testified against the Defendant in the ensuing trial.

On cross-examination, the State played a video recording of Officer Compton's conversation with Ms. West. In the recording, Ms. West showed Officer Compton where the cartridge casings were on the ground outside her house. Officer Compton asked Ms. West if the Defendant had shot into her house, and she said that he had had problems with her son, Mr. Harbison, in the past. She stated that Mr. Harbison testified against the Defendant in juvenile proceedings. She told Officer Compton that she had received "a threat on the phone, and then all of sudden, 'bop, bop, bop,'" indicating gunfire. Ms. West stated that she was "on the floor" when the shooting happened. Ms. West told Officer Compton that there were bullets all through the house. She showed Officer Compton where she was lying on the floor when the shooting started. Ms. West said that the caller said to Mr. Harbison, "This is Cuben, you out [of jail] now." She said, "I guess they found out [Mr. Harbison] was out [of jail]." Ms. West stated that Mr. Harbison had driven away from the house after the shooting. She said that "all this was about" "whatever happened at the club" and that Mr. Harbison had testified in court about the club incident. Officer Compton testified that he

recorded Ms. West's information and the information she provided about Mr. Harbison. He also walked around Ms. West's house and observed bullet holes and shell casings.

Investigator Wardlaw was recalled to testify by the Defendant. He testified that he investigated the blocked phone call to Ms. West that occurred immediately prior to the shooting. He obtained a search warrant for the cell phone number 865-308-0222, registered to the Defendant. Investigator Wardlaw was told that Ms. West received the call at 1:26 p.m. on the day of the shooting, so he checked the records for the 0222 number to determine whether any outgoing calls had been made at that time. The records reflected that no calls were made.

Investigator Wardlaw testified that he received information from Officer Compton that Ms. West had said the shooting was in retaliation for Mr. Harbison's testifying against the Defendant. Investigator Wardlaw agreed that, upon further investigation, he discovered that the incident at the club had occurred between Mr. Harbison, Mr. Brown, and Mr. Campbell and that the Defendant was not involved.

On redirect-examination, Investigator Wardlaw agreed that the Defendant was acquainted with Mr. Campbell and Mr. Brown. Investigator Wardlaw was shown a still-shot from the cell phone video showing the Defendant holding a gun and was asked to compare it to the gun seized from the vehicle at the August 21, 2012 accident. Investigator Wardlaw stated that both weapons were Smith and Wesson SD40 models and had similar insignia on them.

At this point during the trial, the Defendant sought to introduce a letter from Mr. Harbison to his mother, Ms. West, in which he stated that Ms. West was not at the house when the shooting occurred and that he and the Defendant did not have any problems between them. The State objected, contending that the letter was hearsay and that it could not be admitted under any hearsay exceptions. The trial court agreed that the letter was hearsay and therefore inadmissible.

Based upon this evidence, the jury convicted the Defendant of attempted second degree murder, employing a weapon during the commission of attempted second degree murder, attempted first degree premeditated murder, employing a weapon during the commission of attempted first degree premeditated murder, and reckless endangerment.

*Lagrone*, 2016 Tenn. Crim. App. LEXIS 751, at *21–39.

## III.    FEDERAL HABEAS CLAIMS

In his § 2254 petition, Petitioner raises the following claims:

GROUND ONE: Ineffective counsel where counsel did not investigate, interview, subpoena, and/or call LaJuan Harbison. . . .

GROUND TWO: Counsel failed to make a confrontation clause and/or hearsay objection and mistrial request based upon the prosecution's introduction of testimony as to what Mr. Harbison said on the phone call between himself and the person claimed to be Mr. Lagrone. . . .

GROUND THREE: Trial counsel and/or appellate counsel failed to make any objection, request for a mistrial or challenge to the prosecution's calling of Ms. West and Ms. Smith as a ruse to bring in improper and prejudicial testimony and evidence. . . .

GROUND FOUR: Counsel was ineffective in introducing the corroborating and convicting prosecution evidence against his client by calling Officer Compton and recalling prosecution investigator Wardlaw on behalf of the defense absent any full investigation as to what they would say. . . .

5. For purposes of mitigating sentencing in this case, counsel failed to thoroughly investigate the case by consulting with or otherwise adducing expert witness proof relative establishing or otherwise raising the issue of Petitioner Lagrone's young age as affecting his ability to act rationally under the circumstances as he believed them to exist in this case, and relative his juvenile offenses, despite overwhelmingly available scientific evidence and experts in this field who could have testified relative thereto, hence being able to negate the essential elements for the substantial convictions and/or mitigated the sentencing herein. . . .

6. The prosecution suppressed exculpatory evidence in the form of the fact that the alleged victims, Ms. Oracle West and/or her son LaJuan Harbison, received and/or were to receive victims' compensation fund compensation-approved by the prosecution-for the cooperation in the case. . . .

7. A. The Prosecution suppressed exculpatory evidence in the form of the fact that there was evidence-information known to them establishing the fact that Ms. Oracle West was not at the residence at the time alleged shooting. . . .

7. B. Counsel was ineffective for having failed to raise this constitutional suppression claim during the trial, motion for new trial and/or direct appeal.

(Doc. 1, at 4–14 (emphasis omitted).)

## IV. STANDARD OF REVIEW

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2241, *et seq.*, allows a federal court to grant habeas corpus relief on a claim adjudicated on the merits in a state court only where that adjudication: (1) "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established" United States Supreme Court precedent; or (2) "resulted in a decision that was based on an unreasonable determination of facts in light of the evidence presented." *See* 28 U.S.C. § 2254(d)(1)–(2); *Schriro*, 550 U.S. at 473.

This Court may grant habeas corpus relief under the "contrary to" clause where the state court: (1) "arrive[d] at a conclusion opposite to that reached by [the Supreme Court] on a question of law; or (2) decide[d] a case differently than the Supreme Court on a set of materially indistinguishable facts." *See Williams v. Taylor*, 529 U.S. 362, 405 (2000). The Court may grant habeas corpus relief under the "unreasonable application" clause where the state court applied the correct legal principle to the facts in an unreasonable manner. *Id.* at 407.

However, even an incorrect state court decision is not necessarily unreasonable. *See Schriro*, 550 U.S. at 473 ("The question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable— a substantially higher threshold") (citing *Williams*, 529 U.S. at 410). Rather, this Court may grant relief for a claim decided on its merits in state court only where the state court ruling "was so lacking in justification that there was an error understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011).

## V. ANALYSIS

Petitioner contends that he is entitled to relief under § 2254 based on ineffective assistance of counsel and the prosecution's violations of *Brady v. Maryland*, 373 U.S. 83, 87

(1963). (Docs. 1, 2.) For the reasons set forth below, Petitioner is not entitled to relief for these claims.

### A.    Exhaustion

First, Respondent asserts that all but one of Petitioner's claims are procedurally defaulted, and none of his claims have merit. (Doc. 9, at 1.) As discussed below, the Court agrees with Respondent.

Before a federal court may grant habeas relief to a state prisoner, the prisoner must exhaust his available state-court remedies. 28 U.S.C. § 2254(b)(1); *O'Sullivan v. Boerckel*, 526 U.S. 838, 842 (1999). Exhaustion requires the petitioner to "fairly present" each federal claim to all levels of the state appellate system by presenting the "same claim under the same theory" up to the state's highest court, *Wagner v. Smith*, 581 F.3d 410, 414, 418 (6th Cir. 2009), to ensure that states have a "full and fair opportunity to rule on the petitioner's claims." *Manning v. Alexander*, 912 F.2d 878, 881 (6th Cir. 1990). Where a petitioner no longer "has the right under the law" to properly exhaust a claim with the state courts, the claim is technically exhausted but procedurally defaulted. *See* 28 U.S.C. § 2254(c); *Atkins v. Holloway*, 792 F.3d 654, 657 (6th Cir. 2015). Federal courts lack jurisdiction to consider the merits of a procedurally defaulted habeas claim unless the petitioner can establish: (1) "cause for the default and actual prejudice as a result of the alleged violation of federal law" or (2) "that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman v. Thompson*, 501 U.S. 722, 750 (1991).

Here, the only claim that Petitioner fairly presented to the TCCA is his claim that counsel was ineffective for calling Officer Compton as a defense witness. *See Lagrone*, 2020 Tenn. Crim. App. LEXIS 426. Accordingly, that claim is properly exhausted and the Court may

consider it on the merits. *See Adams v. Holland*, 330 F.3d 398, 402 (6th Cir. 2003) (holding that under Tennessee Supreme Court Rule 39, a Tennessee prisoner exhausts a claim by raising it before the TCCA).

Petitioner did not present any of his other claims to the TCCA and no state remedy is now available to him. *See* Tenn. Code Ann. § 40-30-102(a) (one-year limitation period) and § 40-30-102(c) ("one petition" rule). Hence, those claims are technically exhausted but procedurally defaulted.

Petitioner attempts to excuse his procedural default of his claims by asserting that: (1) failure to consider his claims would be a miscarriage of justice; (2) the ineffective assistance of his post-conviction counsel excuses the procedural default of his claims; and (3) the prosecution's suppression of exculpatory evidence excuses his default of claims relating to (i) victim compensation of Oracle West and LaJuan Harbison and (ii) Oracle West's location at the time of the incident underlying Petitioner's convictions. However, none of these assertions has any merit.

### i. *Miscarriage of Justice*

First, Petitioner alleges that failure to consider all his claims would result in a miscarriage of justice. (Doc. 2, at 6.) In support of this argument, he states that "new record evidence exists . . . establishing his actual innocence in the form of proof from indispensable witnesses Oracle West and LaJuan Harbison . . ." (*Id.*)

A claim that has been procedurally defaulted may be considered on its merits if the petitioner demonstrates that his is "an extraordinary case, where a constitutional violation has probably resulted in the conviction of one who is actually innocent." *Murray v. Carrier*, 477 U.S. 478, 496 (1986)); s*ee also House v. Bell*, 547 U.S. 518, 536 (2006). To obtain review under

this doctrine, the petitioner must demonstrate that new, reliable evidence—either eyewitness accounts, physical evidence, or exculpatory scientific evidence—establishes that it is more likely than not that no reasonable juror would have found the petitioner guilty beyond a reasonable doubt. *House*, 547 U.S. at 536 (citing *Schlup v. Delo*, 513 U.S. 298, 327 (1995)).

As Respondent correctly points out, Petitioner has not presented any new evidence of his innocence. Thus, the miscarriage of justice exception does not excuse his procedural default of any of his claims.

### ii. *Ineffective Assistance of Post-Conviction Counsel*

Petitioner also relies on the ineffective assistance of his post-conviction counsel to excuse his procedural default of his ineffective-assistance-of-counsel claims. "As a general rule, counsel's performance in state postconviction proceedings cannot constitute cause to excuse a procedural default, because there is no constitutional right to counsel in such proceedings." *Carruthers v. Mays*, 889 F.3d 273, 288 (6th Cir. 2018) (citing *Coleman*, 501 U.S. at 757). However, the Supreme Court has recognized a narrow exception to this rule. Where state law effectively requires petitioners to raise an ineffective-assistance-of-counsel claim for the first time in post-conviction proceedings, ineffective assistance of post-conviction counsel may serve as "cause" to excuse the procedural default of a substantial ineffective assistance of trial counsel claim. *Trevino v. Thaler*, 133 S.Ct. 1911, 1918–21 (2013); *Martinez v. Ryan*, 132 S. Ct. 1309, 1320 (2012). A claim is "substantial," where it "has some merit and is debatable among jurists of reason." *Abdur'Rahman v. Carpenter*, 805 F.3d 710, 713 (6th Cir. 2015) (citing *Martinez*, 566 U.S. at 14). This exception, referred to as the *Martinez* exception, applies in Tennessee. *Sutton v. Carpenter*, 745 F.3d 787, 792–95 (6th Cir. 2014).

However, the *Martinez* exception only allows a petitioner to present claims for ineffective assistance of trial counsel that he defaulted due to the ineffective assistance of post-conviction counsel—it does not excuse a petitioner's default of other types of claims. *See Abdur'Rahman*, 805 F.3d at 714. The Supreme Court has declined to extend the *Martinez* exception to excuse a petitioner's procedural default of an ineffective assistance of appellate counsel claim. *Davila v. Davis*, 137 S. Ct. 2058, 2067 (2017).

For the reasons the Court sets forth below in its analysis of each of Petitioner's ineffective-assistance-of counsel-claims, *Martinez* does not excuse Petitioner's default of any of those claims.

### iii.    Prosecution Suppression

Petitioner also alleges that the prosecution's suppression of evidence caused his default of two claims related to (1) victim compensation of Oracle West and Lajuan Harbison and (2) Oracle West's location at the time of the incident underlying his convictions. (Doc. 1, at 13.) Respondent contends that Petitioner's default cannot be excused because his claims are conclusory, and the allegedly suppressed evidence was immaterial. (Doc. 9, at 29–33.) A petitioner who has procedurally defaulted a *Brady* claim satisfies the cause and prejudice test by showing that "the reason for his failure to develop facts in state-court proceedings was the State's suppression of the relevant evidence, and that the suppressed evidence is material for *Brady* purposes." *Henley v. Bell*, 487 F.3d 379, 388 (6th Cir. 2007) (citing *Banks v. Dretke*, 540 U.S. 668, 691 (2004)) (internal quotation marks omitted). For the reasons the Court sets forth below, Petitioner has not shown that the prosecution's suppression of evidence excuses his default of either of these claims.

### B.     Ineffective Assistance of Counsel

In Claims One through Five, Petitioner seeks relief based on ineffective assistance of counsel. He asserts that any procedural default of these claims should be excused based on ineffective assistance of post-conviction counsel. (Doc. 2, at 5–7.) Respondent argues that "[n]one of Petitioner's *Strickland* claims, defaulted or not, satisfy the highly deferential standard of review set by both *Strickland* and 28 U.S.C. § 2254(d)." (Doc. 9, at 12.)

The Sixth Amendment guarantees the right to "reasonably effective assistance" of counsel. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). To prevail on a claim of ineffective assistance of counsel, a petitioner must establish: (1) that his attorney's performance was deficient and (2) that he was prejudiced as a result. *Id*. To satisfy the performance prong, a petitioner must show "that counsel's representation fell below an objective standard of reasonableness." *Id.* at 671. The evaluation of counsel's performance must be made "from counsel's perspective at the time of the alleged error and in light of all the circumstances, and the standard of review is highly deferential." *Kimmelman v. Morrison*, 477 U.S. 365, 381 (1986). To satisfy the prejudice prong, a petitioner must show "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. Thus, "[a]n error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Id.* at 691.

A claimant must establish both prongs of a claim for ineffective assistance of counsel to meet his burden, and, if either prong is not satisfied, the claim fails. *Id.* at 687. Moreover, a habeas petitioner alleging ineffective assistance of counsel bears a heavy burden, given the

"doubly deferential" review of a such a claim under § 2254(d)(1). *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009).

**i.**      ***Failure to Investigate and Call LaJuan Harbison***

In his first claim, Petitioner alleges that his counsel acted deficiently by failing to investigate Harbison and call him as a witness at trial. (Doc. 1, at 4–5.) Petitioner asserts that if Harbison had been called, he would have testified that he had "no issues" with Petitioner and that his mother, West, was not present at the time of the shooting. (*Id.* at 4.)

An attorney's failure to conduct a reasonable investigation of a "known and potentially important witness" can constitute deficient performance. *United States v. Arny*, 831 F.3d 725, 732 (6th Cir. 2016) (citing *Parrish Towns v. Smith*, 395 F.3d 251, 259 (6th Cir. 2005)). However, Petitioner's attorney did investigate Harbison. The record shows that Petitioner's attorney spoke with Harbison and his attorney prior to trial. (Doc. 8-34, at 18–19.) Petitioner's attorney obtained a letter from Harbison, stating that his mother was not home at the time of the offense and that he did not have a problem with Petitioner. (Doc. 8-16, at 7; Doc. 8-21, at 60–61.) However, Harbison's attorney insisted that Harbison—who was being prosecuted for attempted murder by the same prosecutor who was handling Petitioner's case—would plead the Fifth Amendment if called to testify. (Doc. 8-34, at 18–19.) Petitioner has not identified any further steps his attorney should have taken in this investigation.

Nor has Petitioner shown that his attorney performed deficiently by not calling Harbison. "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Davis v. Lafler*, 658 F.3d 525, 537 (6th Cir. 2011) (citing *Strickland*, 466 U.S. at 690–91). Here, the record reflects that trial counsel conducted a thorough investigation of Harbison and, expecting he would plead the Fifth Amendment, decided not to

17

enlist him as a defense witness. Petitioner has not presented any evidence showing that his attorney failed to adequately consider Harbison as a potential witness. Accordingly, the Court must assume that Petitioner's attorney made a strategic decision not to call him.

Moreover, even assuming Harbison would have testified as Petitioner expects,[1] it is not probable that the jury would have credited Harbison's testimony about West's location over West's own testimony, which was corroborated by Daisy Smith and West's interview with Officer Compton at the scene. And although Harbison's statement that he did not have a problem with Petitioner would have supported the defense theory that Petitioner lacked motive, that statement would not likely have altered the outcome, given the strength of the State's evidence. Hence, Petitioner has not shown prejudice. *Samatar v. Clarridge*, 225 F. App'x 366, 372 (6th Cir. 2007) ("Absent a showing of prejudice, the failure to call a witness does not deprive a defendant of effective assistance of counsel.").

Because Petitioner's claim is without merit, *Martinez* does not excuse his procedural default.

### ii. *Failure to Challenge Hearsay Testimony of LaJuan Harbison's Statements During Four-Way Phone Call*

Petitioner claims that his attorney was ineffective for failing to object or request a mistrial in response to Smith and West's testimony about what Harbison said during the four-way phone call. (Doc. 1, at 5–6.) He asserts that "jurisprudence" prohibits the introduction of these statements on hearsay and/or confrontation clause grounds. (*Id.* at 5.)

---

[1] As noted above, in the letter he provided to Petitioner's counsel prior to trial, Harbison indicated that his mother was not home at the time of the offense and that he did not have a problem with Petitioner. (*See* Doc. 8-16, at 7.) Harbison made virtually the same statements at the motion for new trial, where he also indicated that if the defense had called him, he would have testified. (Doc. 8-21, 60–61, 66.) However, at Harbison's own trial—which took place after Petitioner's—Harbison testified that both he *and* his mother were home during the incident. (Doc. 8-25, at 31–32, 34.)

At trial, West testified that she could not really recall the conversation between Harbison and Petitioner, stating "I just heard what's up, and I heard my son say, it's nothing, it's nothing." (Doc. 8-5, at 109–110.) Regarding Harbison's part in the call, Smith stated:

> So him and Cub[e]n get to talking. I just remember a couple of the things that was said. So Cub[e]n asked him, like, do you have any beef with me? So he like, no, I don't have no beef with you. So I guess Cub[e]n asked him that about three times. He said he didn't have no beef with Cub[e]n. Then he say – then Cub[e]n say, where you at? So he like, why you want to know where I'm at? So he asked him that probably like two more times, like where you at? Where you at? So LaJuan like, why you – why do you want to know where I'm at?

(*Id.* at 85–86.) According to Smith, several seconds after the exchange described above, she heard the sound of static or gunshots and the conversation ended.

The statements that these witnesses attributed to Harbison do not implicate the Confrontation Clause. The Confrontation Clause protects a defendant's right "to be confronted with the witnesses against him." U.S. Const. amend. VI. Under the Clause, "a testimonial statement of a witness who does not testify at trial cannot be admitted unless the witness is unavailable and the defendant had prior opportunity to examine the witness." *Nobles v. Woods*, 613 F. App'x 487, 491 (6th Cir. 2015) (citing *Crawford v. Washington*, 541 U.S. 36, 59 (2004)). "A statement is testimonial if a reasonable person in the declarant's position would have anticipated the use of the statement in a criminal proceeding." *United States v. Boyd*, 640 F.3d 657, 665 (6th Cir. 2011) (citation omitted). Here, none of the statements attributed to Harbison were made in anticipation of a criminal proceeding. Accordingly, they were not testimonial, and the Confrontation Clause does not bar their admission. *United States v. Johnson*, 509 F. App'x 487, 494 (6th Cir. 2012) ("The Confrontation Clause does not apply . . . to nontestimonial statements.").

Even if Petitioner's attorney could have raised a successful hearsay objection, that error would not have affected the judgment. The testimony regarding Harbison's part in the four-way phone call was not inculpatory. Indeed, Smith's testimony that Harbison did not have a "beef" with Petitioner was favorable to the defense. Accordingly, Petitioner has not shown "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. at 694. This claim is not substantial, and therefore *Martinez* does not excuse Petitioner's procedural default.

### iii. Failure to Challenge the Prosecution Calling Daisy Smith and Oracle West as a Mere Ruse to Introduce Improper Testimony

Petitioner argues that his trial attorney and/or appellate attorney acted deficiently by failing to challenge the prosecution's having called Smith and West as a "mere ruse" to bring in improper and prejudicial testimony as substantive evidence. (Doc. 2, at 14, 17–18; *see also* Doc. 1, at 6–7). He contends that "despite Ms. Smith and Ms. West both not having any real testimony to give[,]" the State called them,

> knowing that the witnesses would open the door to other testimony that would force the defense to call members of law enforcement who would in turn get in prior otherwise inadmissible testimony of these witnesses that would establish or otherwise raise the specter that both witnesses knew the petitioner was the one who had committed the offense, knew that he and LaJuan Harbison had issues in the past and that would establish the same as a motive relative [to] the shooting.

(Doc. 2, at 17–18.) In particular, Petitioner alleges that the State used Smith and West to force the defense to call Officer Compton and then the State used Officer Compton to "effectively impeach" the testimony of Smith and West. (*Id*. at 18.) In support of this argument, he cites *Mays v. State,* 495 S.W.2d 833 (Tenn. Crim. App. 1972). (*Id*. at 15–17.)

Under the Tennessee Rules of Evidence, a party may not impeach its own witness as "a mere ruse to introduce highly prejudicial and improper testimony." *State v. Payne*, C.C.A. NO.

03C01-9202-CR-45, 1993 Tenn. Crim. App. LEXIS 47, at *4–5 (Tenn. Crim. App. Feb. 2, 1993); *see also Mays,* 495 S.W.2d at 836–837 (State improperly impeached its own witnesses where the sole purpose of impeachment was to put out of court statements before the jury). However, this legal principle has no application here.

Far from being called as a "mere ruse," Smith and West provided important testimony that the State relied upon in proving its case. And it was the defense, not the State, that called Officer Compton in an effort to impeach Smith and West's testimony. Hence, an objection on the ground that Smith and West were called merely as a pretext to admit impeachment evidence through Officer Compton would have been meritless. "[C]ounsel cannot be ineffective for failing to raise a meritless objection." *Porter v. Eppinger*, No. 19-3443, 2021 U.S. App. LEXIS 26020, at *20–21 (6th Cir. Aug. 27, 2021). Accordingly, *Martinez* does not excuse the procedural default of this ineffective-assistance-of-trial-counsel claim.

Also, to the extent Petitioner alleges ineffectiveness of appellate counsel, *Martinez* offers no relief. *See Davila*, 137 S. Ct. at 2067 (2017) (declining to extend the *Martinez* exception to claims of ineffective assistance of appellate counsel).

### iv.    *Calling Officer Compton and Recalling Investigator Wardlaw*

In his fourth claim, Petitioner alleges that trial counsel was deficient for calling Officer Compton and recalling Investigator Wardlaw without adequate investigation into what they would say. (Doc. 1, at 8; Doc. 2, at 20–22). Petitioner contends that calling these witnesses was unnecessary and opened the door to prejudicial evidence that altered the outcome of his trial. (*See, e.g.* Doc. 2, at 22.)

a. Officer Compton

As noted above, Petitioner properly exhausted this claim as it relates to Officer Compton.

In rejecting Petitioner's argument, the TCCA stated as follows:

> Our review of the record supports the post-conviction court's findings. At trial, Ms. West testified she was at home when gunshots were fired at her house. Trial counsel believed that Ms. West's statement to Officer Compton indicated she was not home during the shooting, so he called Officer Compton as a witness. However, Officer Compton did not testify the way trial counsel anticipated, and trial counsel later considered him a "terrible witness." During cross-examination of Officer Compton, the State introduced a video recording of Ms. West's statement to Officer Compton, wherein she claimed that she was, in fact, home during the shooting. While trial counsel's decision to call Officer Compton was unsuccessful, it was a tactical decision based on his belief that he could impeach Ms. West's testimony and prove she was not home during the shooting. The fact that a trial strategy failed is not, by itself, enough to establish that trial counsel was deficient. *Cooper* [*v. State*], 847 S.W.2d [521,] 528 [(Tenn. Crim. App. 1992)]. Regardless, as noted by the post-conviction court, all the evidence introduced through Officer Compton, including the petitioner's threatening phone call to Ms. West and his prior incident with Mr. Harbison at a nightclub, had already been introduced through a recording of Ms. West's 9-1-1 call as well as Ms. West's testimony. The State also introduced evidence that the petitioner was found in possession of guns which matched the guns used in the shooting, and a video depicted him holding those guns. Accordingly, the petitioner has failed to demonstrate that the outcome of his trial would have been different if trial counsel had not called Officer Compton as a witness. Therefore, the petitioner has failed to demonstrate he was prejudiced, and he is not entitled to relief.

*Lagrone*, 2020 Tenn. Crim. App. LEXIS 426, at *10-12.

Petitioner has not established that the TCCA's decision was an unreasonable application of federal law or an unreasonable determination of the facts in light of the evidence presented. The record supports the TCCA's finding that Petitioner's attorney made a reasonable decision to call Officer Compton.[2] While counsel's strategy proved unsuccessful, like the TCCA, this Court

---

[2] At the post-conviction hearing, Petitioner's attorney explained that he called Officer Compton because "[w]e had no extrinsic proof, other than the statements that Ms. West made to Officer Compton that she had arrived at the scene after the shooting occurred" and therefore, "we had to present that specific inconsistent statement that Ms. West had made." (Doc. 8-34, at 23.)

will not second-guess this decision.  *See Rayborn v. United States*, 489 F. App'x 871, 878 (6th Cir. 2012) ("[W]hether to call a witness and how to conduct a witness' testimony are classic questions of trial strategy that merit *Strickland* deference.").  Moreover, Petitioner has not met his burden of establishing prejudice.  He alleges that the introduction of Officer Compton's interview with West allowed the State to "complete the account and missing pieces" of her testimony [Doc. 2 p. 22].  However, he has not identified any material piece of evidence admitted through Officer Compton that had not already been presented to the jury.

Accordingly, *Martinez* does not excuse Petitioner's procedural default of this claim, and he is not entitled to relief under § 2254 for this claim.

        b.     <u>Investigator Wardlaw</u>

Petitioner alleges that his attorney acted ineffectively by recalling Investigator Wardlaw during the defense's case.  (Doc. 1, at 8; Doc. 2, at 20–22.)  The State certainly used the recall of Investigator Wardlaw to emphasize and further develop points raised during his direct examination.  Perhaps most significantly, on redirect, Investigator Wardlaw testified further regarding similarities between the gun Petitioner was holding in his cell phone videos and a gun used in the offense.  (Doc. 8-8, at 95–99.)  He also clarified that Petitioner was friends with individuals who were involved in the club incident and who were not friends with Harbison.  (*Id.* at 93–95.)  However, because the main substance of Investigator Wardlaw's testimony had already been introduced the first time he took the stand, it is not probable his additional recall testimony altered the outcome of the trial.

Furthermore, as with Officer Compton, Petitioner's attorney had a reasonable purpose for calling Investigator Wardlaw.  At the post-conviction hearing, Petitioner's attorney explained that he recalled Investigator Wardlaw to confirm that Petitioner was not involved in the shooting

at the club.  (Doc. 8-34, at 27.)  By confirming that Petitioner was not involved in the club shooting, the defense refuted a possible motive for Petitioner to attempt to murder Harbison. Because Petitioner's attorney had a reasonable strategic purpose in recalling Investigator Wardlow, his decision does not constitute ineffective assistance.[3]  *See Moore v. Mitchell*, 708 F.3d 760, 786 (6th Cir. 2013) (citing *Hoxsie v. Kerby*, 108 F.3d 1239, 1246 (10th Cir. 1997) ("in choosing to call a witness, '[f]or counsel's [decision] to rise to the level of constitutional ineffectiveness, the decision . . . must have been completely unreasonable, not merely wrong, so that it bears no relationship to a possible defense strategy.").

Accordingly, this claim is not substantial, and *Martinez* does not excuse Petitioner's procedural default.

### v. *Failure to Introduce Expert on Youthful Decision Making*

Petitioner contends that his attorney should have obtained an expert witness to testify at trial and/or sentencing regarding the effect of his young age on his decision making.  (Doc. 1, at 12–13; Doc. 2, at 23–26.)  He asserts that such testimony "would have negated any issue of premeditation or knowing conduct" and would have "substantiated the defense and/or conviction for a lesser offense or sentence."  (Doc. 2, at 26.)  He acknowledges that he was eighteen or nineteen years old at the time of the offense but asserts that scientific data concerning juvenile development also applies to those still in their teens.  (*Id.* at 25–26.)

The United States Supreme Court has recognized that juveniles are "constitutionally different from adults for the purposes of sentencing" due to their lack of maturity and vulnerability to negative influences.  *Roper v. Simmons*, 543 U.S. 551, 569 (2005).  Petitioner is

---

[3] The record indicates that Petitioner's attorney also recalled Investigator Wardlaw in order to question him about Petitioner's cell phone records, which had not yet been admitted when Investigator Wardlaw first took the stand.  (Doc. 8-7, at 97–98.)

correct that scientific research concerning juveniles applies, to some extent, to young adults. *See Pike v. Gross*, 936 F.3d 372, 385 (6th Cir. 2019) ("Since *Roper* was decided, scientists have established that 'biological and psychological development continues into the early twenties.'") (citing Elizabeth S. Scott et al., *Young Adulthood as a Transitional Legal Category: Science, Social Change, and Justice Policy*, 85 Fordham L. Rev. 641, 642 (2016)).

However, "[a] habeas petitioner's claim that trial counsel was ineffective for failing to call an expert witness cannot be based on speculation." *Keith v. Mitchell*, 455 F. 3d 662, 672 (6th Cir. 2006). Petitioner has not identified an expert who would have testified or shown what the content of the witness's testimony would have been. Absent this evidence, Petitioner cannot establish that his attorney's performance was deficient.

Even if an expert on youthful decision making could have testified, Petitioner has not explained why such an expert would have been necessary at trial. As Petitioner's attorney noted at the post-conviction hearing, the defense theory was that Petitioner was not involved in the shooting. (Doc. 8-34, at 15.) Presenting the jury with testimony aimed at negating Petitioner's criminal intent in committing the shooting would have been incompatible with that theory. Accordingly, a decision by Petitioner's attorney not to call an expert on youthful decision-making at trial—assuming such an expert existed—would have been reasonable. *Branch v. Phillips*, No. 1:07-cv-1283, 2010 U.S. Dist. LEXIS 40478, at *33 (W.D. Mich. Mar. 24, 2010) ("To be deemed ineffective assistance, a defense attorney's decision not to call an expert witness must be so patently unreasonable that no competent attorney would have chosen the strategy.").

Moreover, Petitioner cannot establish that he was prejudiced at sentencing. As the trial court observed at the sentencing hearing, Petitioner had a serious criminal history that included juvenile adjudications for aggravated robberies, firearms offenses, and assaults. (Doc. 8-11, at

35.)  Also, the instant offense involved shooting fifteen rounds into a dwelling knowing that at least two people were inside, leading the trial court to conclude that Petitioner had "no hesitation about committing a crime when the risk to human life was high." (*Id.* at 35–36.)  Given Petitioner's violent criminal record and the aggravated nature of the offense, it is not probable that expert testimony regarding youthful decision making would have resulted in a lesser sentence.

As such, *Martinez* does not excuse Petitioner's default of this insubstantial claim, and Petitioner is not entitled to relief under § 2254 for this claim.

### C.    *Brady* Violations

As set forth above, Petitioner also raises two claims based on alleged violations of *Brady v. Maryland*, 373 U.S. 83, 87 (1963).  (Doc. 1, at 13–15; Doc. 2, at 28–31.)

The Due Process Clause of the Fourteenth Amendment requires that the state disclose to criminal defendants "evidence that is either material to the guilt of the defendant or relevant to the punishment to be imposed."  *California v. Trombetta*, 467 U.S. 479, 485 (1984) (citing *Brady*, 373 U.S. at 97).  "Even in the absence of a specific request, the prosecution has a duty to turn over exculpatory evidence that would raise a reasonable doubt about the defendant's guilt." *Id.* at 485 (quoting *United States v. Agurs*, 427 U.S. 97, 112 (1976).

To establish a *Brady* violation, a petitioner must show "that the prosecutor suppressed evidence; that such evidence was favorable to the defense; and that the suppressed evidence was material."  *Gillard v. Mitchell*, 445 F.3d 883, 894 (6th Cir. 2006) (citing *Carter v. Bell*, 218 F.3d 581, 601 (6th Cir. 2000)).  Favorable evidence is evidence that is "exculpatory" or "impeaching." *Strickler v. Greene*, 527 U.S. 263, 281–82 (1999).  Evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding

would have been different." *Youngblood v. West Virginia*, 547 U.S. 867, 870 (2006) (internal quotation marks omitted). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Pennsylvania v. Ritchie*, 480 U.S. 39, 57 (1987) (internal quotation marks omitted).

### i.    *Victim Compensation*

First, Petitioner claims that the prosecution violated *Brady* by failing to disclose that the victims West and/or Harbison "were receiving or had received a substantial amount of funds through the victim compensation fund of which required their cooperation in this case."[4]  (Doc. 2, at 28–29.)  He argues that if this information had been known at trial, West's credibility would have been damaged to the detriment of the prosecution.  (*Id.* at 29.)

If the prosecution expressly or tacitly offers a witness a benefit in exchange for her testimony, that agreement would be usable for impeachment and must be disclosed to the defense. *Joseph v. Coyle*, 469 F.3d 441, 470 (6th Cir. 2006) (citing *Wisehart v. Davis*, 408 F.3d 321, 323–324 (7th Cir. 2005)).  However, Petitioner has not presented any evidence that the government promised West or Harbison compensation in exchange for their cooperation. Instead, his allegation is mere speculation, which is insufficient to establish a *Brady* claim.  *See Matthews v. Ishee*, 486 F.3d 883, 895–896 (6th Cir. 2007) (a mere inference that the prosecution must have made a pre-trial deal with a witness in exchange for testimony is insufficient to establish a *Brady* violation.).

---

[4] Petitioner further alleges that West falsely testified that "neither she nor her son received any benefit, financial or otherwise, for offering testimony." (Doc. 1, at 14.)  Upon the court's review of the trial transcript, it does not appear that West ever stated that she received no benefit for her cooperation.  Rather, she merely testified that the prosecution did not reward her for her testimony by giving her son, who had pending criminal charges, a "deal." (Doc. 8-6, at 41–42.)

Even if Petitioner's allegation were true, this impeachment evidence would not have had a material effect on West's credibility. Receiving victim compensation is not the kind of impeachment evidence that would necessarily discredit a witness. Moreover, West's testimony was corroborated by other evidence at trial, including the 911 call, the testimony of Smith, and her own statements to Officer Compton made shortly after the shooting. And evidence is not material for *Brady* purposes where it merely "impeach[es] the testimony of a witness whose account is strongly corroborated by additional evidence supporting a guilty verdict." *Eakes v. Sexton*, 592 F. App'x 422, 427–28 (6th Cir. 2014) (citations omitted).

### ii. *Oracle West's Location*

Second, Petitioner argues that the prosecution violated *Brady* by suppressing evidence that West was not at the home when the events occurred. (Doc. 1, at 14–15; Doc. 2, at 29–30.) He also argues that his trial and appellate counsel were ineffective for failing to raise this *Brady* claim. (Doc. 1, at 14–15; Doc. 2, at 29–30.)

It is not clear what evidence Petitioner believes was suppressed. The only explanation he provides is the vague statement that "LaJuan Harbison was the prosecution's victim-witness, but, as opposed to disclosing this information to the defense and/or jury the prosecution suppressed this evidence and instead introduced false and misleading evidence relative thereto." (Doc. 1, at 15.) Petitioner may be arguing that the State withheld statements by Harbison indicating that West was not home during the shooting. However, that evidence was not suppressed because Petitioner's attorney obtained that same information during his interview with Harbison prior to trial. (Doc. 8-16, at 7; Doc. 8-21, at 60–61.) *Abdur'Rahman v. Colson*, 649 F.3d 468, 474 (6th Cir. 2011) (quoting *United States v. Clark*, 928 F.2d 733, 738 (6th Cir. 1991)) (No *Brady* violation exists if a defendant knew or had reason to know '"the essential facts permitting him to

take advantage of any exculpatory information,'" or where the evidence was available to him

from another source.)).  In any event, Petitioner has not identified any evidence that was

improperly withheld by the State.  Therefore, this claim is without merit.

Because the claim is without merit, Petitioner's counsel was not ineffective for failing to

bring it.  *Tackett v. Trierweiler*, 956 F.3d 358, 375 (6th Cir. 2020) ("The failure to raise a

meritless claim does not constitute ineffective assistance of counsel.").

## VI.    CONCLUSION

For the reasons set forth above, the petition for habeas corpus relief under § 2254 will be

**DENIED** and this action will be **DISMISSED**.

The Court must now consider whether to issue a certificate of appealability ("COA"),

should Petitioner file a notice of appeal.  Under 28 U.S.C. § 2253(a) and (c), a petitioner may

appeal a final order in a habeas proceeding only if he is issued a COA, and a COA may only be

issued where a Petitioner has made a substantial showing of the denial of a constitutional right.

28 U.S.C. § 2253(c)(2).  Where the court dismissed a claim on the merits but reasonable jurists

could conclude the issues raised are adequate to deserve further review, the petitioner has made a

substantial showing of the denial of a constitutional right.  *See Miller-El v. Cockrell*, 537 U.S.

322, 327, 336 (2003); *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).  When a district court denies

a habeas petition on a procedural basis without reaching the underlying claim, a COA should

only issue if "jurists of reason would find it debatable whether the petition states a valid claim of

the denial of a constitutional right and that jurists of reason would find it debatable whether the

district court was correct in its procedural ruling."  *Slack*, 529 U.S. at 484.

Reasonable jurists could not conclude that Petitioner has made a substantial showing of a

denial of a constitutional right for his sufficiency of the evidence, ineffective assistance of

counsel, or structural error claims addressed on the merits above such that they would be adequate to deserve further review. Moreover, jurists of reason would not disagree with the Court's finding that Petitioner procedurally defaulted the claims that he did not present to the TCCA. Accordingly, a **COA SHALL NOT ISSUE.** Also, the Court **CERTIFIES** that any appeal from this action would not be taken in good faith and would be totally frivolous. Fed. R. App. P. 24.

       **AN APPROPRIATE JUDGMENT WILL ENTER.**

                                    **_/s/ Travis R. McDonough_**
                                      **TRAVIS R. MCDONOUGH**
                                      **UNITED STATES DISTRICT JUDGE**